## J. H. Crook, County Clerk v. Bartlett, et al.

(Decided October 15, 1913).

### Appeal from Anderson Circuit Court.

1. Elections—Right of Women to Vote for County School Superintendent.—Under the act of March 12, 1912, read in connection with the act of March 18, 1912, women possessing the required qualifications are authorized to vote in the election of county school superintendent.

2. Elections—Right of Women to Vote for School Officers—Constitutional Law.—Under Section 155 of the Constitution, elections for school trustees and other school district elections, are left to the discretion of the Legislature; and the Legislature may create such districts as it sees fit, and authorize the election of school officers in these districts, and has power to give women the right to vote in such elections.

3. Elections—Separate Ballot for Women in Election for School Superintendent.—An injunction requiring the clerk to print a separate ballot for the use of women at the November election for county school superintendent was proper.

JAMES GARNETT, Attorney General, FRANK L. RIPY for appellant.

W. P. MARSH for appellees.

Opinion of the Court by Chief Justice Hobson—
Overruling motion to dissolve injunction.

This proceeding was instituted by a petition filed in the Anderson Circuit Court, seeking a mandatory injunction, requiring the county clerk to print ballots to be used by the female voters in the election for county school superintendent of Anderson County. The circuit court granted the injunction and a motion has been entered before me to dissolve it. The whole court sat with me in determining the motion.

By the act approved March 12, 1912, it is provided as follows:

"1. That all women possessing the legal qualifications required of male voters in any common school election, and who in addition are able to read and write, shall be qualified and entitled to vote at all elections of school trustees and other school officers required to be elected by the people, and upon all school measures or questions submitted to a vote of the people; and all women possessing the legal qualifications required as to males shall be eligible to hold any school office or office pertaining to the management of schools. Provided, however, that this act shall not apply to any election the qualifications of the voters at which are otherwise prescribed by the Constitution nor to any office as to which the Constitution otherwise prescribes the qualifications of the persons eligible thereto.

"2. In all places where the registration of the qualified voters is now or may hereafter be required, women, who are by this act, qualified to vote shall be registered at the same time and place and by the same officers and in the same manner as male voters; their registration, however, being made in a separate book to be furnished by the county clerk as is prescribed by law in the case of male voters. And all the provisions of law relating to the registration of male voters are hereby made applicable to the registration of women qualified to vote by this act.

"3. When the elections referred to in section 1 of this act are held on the same day with the State, county or city election, separate ballots, similar to those required in other elections, except that they contain only the names of candidates for school officers or questions relating to schools, shall be provided for women voters qualified under this act; otherwise the elections shall be

held according to the provisions of the general election law.

"4. All laws or parts of laws in conflict herewith are hereby repealed." (See Acts 1912, p. 193.)

At the same session of the General Assembly by an act approved March 18, 1912, it is provided as follows:

"1. * * * There shall be a county superintendent of common schools in each county of the State who shall be possessed of good moral character and ability to manage the common school interests of the county efficiently. He shall possess a good English education and shall be competent to examine the teachers who shall apply to teach the common schools in the county. He shall be twenty-four years old at the time of qualifying, a citizen of Kentucky, shall have resided two years next preceding the election in this county and one year in the county for which he is a candidate. * * *

"3. The county superintendent shall be elected by the qualified voters of each county, qualified to vote in all school elections at the regular November election, provided by law and shall hold his office for four years from the first Monday in January following his election or until the election and qualification of his successor. The county superintendent shall be elected and the vote canvassed and the result certified by the same officers and in the same manner as in the election of other county officers, and within ten days after the election, the clerk of the county court shall forward a copy of the certificate of election to the superintendent of public instruction."

The solution of the questions involved turns on the proper construction of these acts, and their effect under the provisions of the Constitution. The conclusions of a majority of the court are as follows:

1. By the act of March 18, 1912, the county superintendent shall be elected by the qualified voters of each county qualified to vote in all school elections at the regular November election. What the Legislature meant by voters qualified to vote in all school elections is to be determined by reading the act of March 12 in connection with this act; for the rule is well settled that the acts of the same assembly are to be read together. By the act of March 12, all women possessing the legal qualifications of male voters in any common school election, and who in addition are able to read and write, shall be qualified to vote at all elections for school trustees and other school officers required to be elected by

the people, and upon all school measures submitted to a vote of the people. Women possessing these qualifications are qualified voters of the county qualified to vote in all school elections within the meaning of the act of March 18, 1912. The two acts, therefore, when read together make women possessing the necessary qualifications qualified voters to vote for county superintendent, if this construction does not violate some provision of the Constitution. It is provided by the act of March 12 that the act shall not apply to any election the qualifications of the voters at which are otherwise prescribed by the Constitution, nor to any office as to which the Constitution otherwise prescribes the qualifications of persons eligible thereto. So the question is, had the Legislature the power to confer on women the right to vote for school superintendent?

2. By section 145 of the Constitution, the qualifications of voters is prescribed and only male citizens possessing these qualifications are entitled to vote. By sections 147 and 148 only one election a year is to be held. This is to be held on the first Monday in November between the hours of six o'clock a. m. and seven o'clock p. m. by ballot. Section 155 is in these words:

"The provisions of sections one hundred and forty-five to one hundred and fifty-four, inclusive, shall not apply to the election of school trustees and other common school district elections. Said elections shall be regulated by the General Assembly, except as otherwise provided in this Constitution."

The question to be determined is, what are common school district elections within the meaning of this provision? If the election of a county school superintendent is a common school district election, then it is not included in the provisions of the Constitution and may be regulated by the General Assembly as it may see fit. The Constitution of the State designates by name a large number of State, district and county officers, and prescribes the qualifications voters shall possess in order that they may be entitled to hold the respective offices, and it is conceded that women are not entitled to hold the offices mentioned in the Constitution or to vote in elections at which these Constitution-named officers are elected. But the office of county superintendent of comman schools is not a constitutional office. The Constitution does not prescribe the qualifications of persons who may hold this office or the qualifications of the per-

sons who may vote for candidates for this office. It is an office created by the Legislature of the State, and it is a matter of common knowledge that since the adoption of the present Constitution women in many counties of the State have been elected to this office, and no question of their eligibility has ever been raised. It has been generally conceded that women have the legal right to be elected to and hold the office of county superintendent of common schools, or any other non-constitutional office, since the decision of this court in Atchison v. Lucus, 83 Ky., 451. In that case, the court said:

"We do not mean to adjudge that offices of legislative creation may not be filed by women, or the right of suffrage granted them in certain cases; but, on the contrary, such rights may be conferred. We have been discussing only the provisions of the Constitution affecting the right of suffrage, and the right to hold office when applied to offices created by the Constitution."

As school trustees are by name saved from the operation of the constitutional provisions relating to suffrage and elections, there is no room to doubt that, so far as the qualifications of persons who may hold the office of school trustee or the qualification of persons who may vote for school trustees is concerned, the matter is left entirely in the hands of the General Assembly, and that body is left free to attach such qualifications to eligibility for the office of school trustees and to the right of persons to vote for school trustees as, in its judgment, may be best for the interest of the common schools. (Sisk v. Gardiner, 25 Ky. L. R., 18, Jeffries v. Board of Trustees, 135 Ky., 488).

The section, however, does not mention county superintendent of common schools, or any other school officers, except school trustees; so that the question we have before us depends on whether or not the words "other common school district election" in this section are broad enough to embrace elections for county superintendent of common schools, because if they are, it is obvious that the Legislature was left the liberty to prescribe the qualifications of persons who may hold the office of county superintendent of common schools and the qualifications of persons who may vote for candidates for this office. A narrow construction of these words would confine them to elections relating to taxation for school purposes, or other elections concerning schools that did not involve the election of school officers,

independent of school trustees, and would further confine them to "common school district elections" as distinguished from common school county elections. But no, sufficient reason appears for giving to these words this limited meaning. On the contrary the words "other common school district elections" refer to all elections that have to do with matters relating exclusively to the management and conduct of the affairs of the common schools of the State, saving the office of Superintendent of Public Instruction, which is a constitutional office. Section 155 of the Constitution was evidently intended to take all school elections out of the provisions of the article on suffrage and elections and put these elections in a class by themselves, to be controlled by the will of the General Assembly of the State.

The argument is made that the word "district" in the sentence "other common school district elections" has reference to a district composed of part of a county and not the entire county, and therefore as the county superintendent is elected by the people of the county, his election is not a common school "district" election within the meaning of section 155, and this being so, the qualifications of persons who vote for county superintendent are prescribed by section 145 of the Constitution, which expressly excludes women from the right of suffrage by conferring this privilege upon "male" citizens.

There would be much force in this position if the word "district" should be given the meaning contended for, but it can not be maintained that this word as used in the section refers entirely to a part of a county. A common school district has no permanently fixed boundary. It may embrace the whole of a county, or indeed several counties, or a small portion of a county. The size of common school districts is left entirely in the discretion of the General Assembly. New methods to improve its condition are being constantly introduced into the school system of the State, and it may be but a short time until the office of school trustee is dispensed with and the common school district as it now exists abolished. Indeed the county board of education virtually occupies the place formerly filled by school trustees, and yet it seems evident that as women have the right to vote for school trustees, they would also have the right to vote for other school officers who take the place of school trustees, although called by another

name, invested with larger powers and elected by the county and not the district.

It is also urged that the county superintendent is a county and not a district officer, because his compensation is paid by the people of the county, but this circumstance is not entitled to weight in determining the status of this officer. If the Legislature should provide for the election of common school trustees by the people of the entire county, as it may do, these trustees might, with as much force, be called county officers. It is a matter of no consequence by what name school officers are designated or by what authority their compensation is paid, or whether they are elected from what may be called districts or the county at large. It is the fact that they are school officers that brings them within the meaning of section 155 and thereby exempts them from the operation of the other sections relating to suffrage and elections.

In excepting school officers and school elections from the general provisions relating to elections, the framers of the Constitution had in view the large purpose of putting all common school elections in a class by themselves, and this manifest purpose should not be frustrated by attaching undue importance to particular words, or by giving to them a meaning that would defeat the intention of section 155 when considered as a whole.

This section should be given a liberal construction and one that will carry out what seemed to be the purpose of its enactment, which was to leave the Legislature a free hand in everything relating to the management and control of the common schools of the State except when restrained by other sections of the Constitution. The Legislature having this view of the meaning of section 155, has from time to time made radical changes in almost every administrative feature of the school laws. For example, it has virtually abolished the school trustee; it has created county boards in place of district boards; it has granted a limited suffrage to women, and then taken it away; it has enlarged district boundaries in this place and decreased them in that; it has, in short, adopted every new method that seemed to it available and practicable for the purpose of affording better educational facilities.

It follows that the circuit court properly granted the injunction, and the motion to dissolve it is overruled.